IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

MIKE MORRISSEY PLAINTIFF

V. No. LR-C-97-707

CAPITOL CAB LEASING Co. DEFENDANT

**DEFENDANTS RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**

Comes the Defendant with its counsel, and submits the following response to Plaintiff's First Set of Interrogatories and Requests for Production of Documents:

**Interrogatory No. 1:** Identify all persons who have knowledge of the allegations contained in plaintiff's Complaint and summarize the facts of which each identified person has knowledge.

**Response:**

a. Buck Haley — investigated allegations.

b. Bill Rogers — investigated allegations.

c. Kenny Rogers — driver of first cab dispatched to the Afterthought on July 2, 1997, and met with Plaintiff and an individual identified by Plaintiff as Keith Klosky regarding transportation of Plaintiff.

d. Steve Bradley — received call to dispatch cab to the Afterthought on July 2, 1997, and dispatched vehicles.

e. Robert Gebhardt — driver who picked up and delivered Plaintiff from the Afterthought on July 2, 1997.

f. Plaintiff, Mike Morrissey — allegations of Complaint.

g. Keith Klosky — identified by Plaintiff as aware of allegations of

RECEIVED
DEC 02 1997
BY:

Exhibit 6

complaint regarding difficulty in receiving taxi service from you and state the date on which the complaint was received.

**Response:** Not applicable.

**Request for Production No. 5:** Please produce, for inspection and copying, any document, not protected by attorney-client privilege, reflecting any communication or complaint identified in the immediately preceding Interrogatory.

**Response:** None.

**Interrogatory No. 13:** State whether you have a policy regarding disabled customers. If yes, describe the policy, the manner in which this policy is communicated to your drivers, and the date on which the policy was adopted.

**Response:** Capitol Cab's policy is to give service to all persons to whom it is able, including those with disabilities. The company is not equipped, and does not offer services to persons requiring, for instance, para-transit services, nor does the company own equipped vans or vehicles. The company attempts in all manner to comply with the requirements of the law. This policy is communicated to drivers verbally on initial interview, and at random times during the year. The policy is also posted on a bulletin board. The company has had this policy since it was founded, and long prior to the enactment of the statute alleged in this action by the Plaintiff.

**Request for Production No. 6:** Please produce, for inspection and copying, any policy described in the immediately preceding Interrogatory.

**Response:** A copy of the posted policy is attached.

**Interrogatory No. 14:** State whether the driver of the first cab dispatched to the Afterthought on July 2, 1997 was disciplined or counseled in any manner for failing to pick up Plaintiff. If yes, describe the actions taken to discipline or counsel the driver of the first cab.

(a) The field of expertise of the witness;

(b) The subject matter which is expected to testify;

(c) The substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each such opinion;

(d) The name and address of each such witness; and

(e) The style of each such case in which each such witness has either testified or given a deposition.

**Response:** At this time, Defendant does not know whether it anticipates calling any expert witnesses until further in the discovery process. At the time such witnesses are identified, the information will be furnished.

**Interrogatory No. 21:** Identify any employees who can testify to (i) employer policies or statements or (ii) conduct showing your policy, practice, and performance.

**Response:** Buck Haley and Bill Rogers.

Capitol Cab Leasing Company, Inc.

By: ______________________
Buck Haley, Owner

**CERTIFICATE OF SERVICE**

I have this day mailed a copy of the foregoing Responses to the Plaintiff by mailing a copy to his counsel, Sherri A. McDonough, Harril & Sutter, Attorneys at Law, P. O. Box 26321, Little Rock, AR 72221.

______________________
Charles L. Carpenter, Jr.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

MIKE MORRISSEY, PLAINTIFF,

VS. NO. LR-C-97-707

CAPITOL CAB, INC., DEFENDANT.

---o---

DEPOSITION

OF

KENNY ROGERS

---o---

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

SHERRI McDONOUGH, ESQUIRE
Harrill & Sutter
11510 Fairview, Suite 200
Little Rock, Arkansas 72221

ON BEHALF OF THE DEFENDANT:

CHARLES L. CARPENTER, JR., ESQUIRE
Attorney at Law
406 West Pershing Boulevard
North Little Rock, Arkansas 72114

---o---



**ORIGINAL**

Exhibit 7

Q During the years you worked for Capitol Cab, did you -- were you aware that they had rules about having to keep your cab clean and not being rude to the fares and that sort of thing?

A Yeah. There is a policy on that.

Q Did you get a written set of rules on that?

A Yes.

Q When did you get that?

A 15 years ago. That comes with common knowledge, you know, you are not ever to be rude to anybody. That's just common courtesy to do that.

Q Sure. But it was also a written set of rules?

A Sure.

Q Who gave you this written list of rules?

A The cab company gives it to you, the City of Little Rock gives you, also, a copy.

Q All right. During the time you worked for Capitol Cab, were you ever disciplined or did you ever get in trouble for breaking any of these rules?

A No. Other than -- on this last incident here?

Q Yes.

A They like laid me off for a week, because I was like -- you know how they investigate you because an incident came up as this one did, and then they decided, well, you know, you are not guilty until you

are proven guilty, and I didn't do anything, so I went back to work driving a cab. They like laid me off for a week.

Q Okay.

A Then they let me go back to work because it was under investigation, you know.

Q Well, I'm going to get to that in a minute. But other than that incident, you never got in trouble for breaking any other rules?

A No.

Q Did Capitol Cab have a policy about picking up people in wheelchairs, or people with disabilities?

A A policy?

Q Yes.

A Like what?

Q Did they tell you any rules about how you would deal with people in wheelchairs?

A Well, that's a hard question to answer. I don't understand what you are talking about.

Q All right. I will try again.

A Okay. Try it again.

Q Before this July incident that we are here about today --

A Uh-huh. (Indicated yes.)

Q -- before that, did Buck Haley or anybody else

from Capitol Cab talk to you or give you written instructions about how you were supposed to treat people in wheelchairs or with disabilities?

A Yeah. You treat everybody with common courtesy and respect, the same as you would treat your mother, you know. Sure.

Q Sure. But did you ever get any specific instructions from Buck Haley or anybody else at Capitol Cab specifically about folks in wheelchairs or with disabilities?

A Well, I don't know. Let me think here. I'm not sure about that. I don't know. All I know is that I did -- the way I did things is to treat everybody with respect.

Q Right. But that wasn't my question. My question was --

A I mean, I don't work for the ambulance company or anything like that.

Q Sure. I just want you to answer my question, if you can.

A Okay.

Q Before July of 1997, do you recall Buck Haley or anybody else from Capitol Cab ever talking to you or giving you written instructions specifically about how to treat disabled people or folks in wheelchairs?

A Well, the City of Little Rock is the one that sets the rules on this. So whatever is in the rules on the City of Little Rock is what we went by. But I don't remember anything that the City of Little Rock ever put specifically on their set of rules, you know, to do that. I don't remember any set of rules.

Q Okay. And I take it, then, that you don't remember Buck Haley or anybody else from Capitol Cab talking to you about how to deal with folks in wheelchairs or disabled people?

A No.

Q Do you think it didn't happen, or do you just not remember it?

A Well, it probably did happen somewhere down the line. I have been doing it for 20 years. He might have told me 15 years ago. It is nothing that I wouldn't already have known, anyway. But no, you know, if it was a new guy, if I had been a new person or something, yeah, he probably tells people like that, somebody that was new. He probably told me 15 years ago, but I don't remember that 15 years ago, but I already knew that, you know, kind of, what I'm talking about.

Q Since you already knew it, he probably didn't tell you again?

A No, he wouldn't have to.

Q What time did you -- well, let me strike that. This incident that we are talking about, it happened on July the 2nd, 1995; does that sound right to you?

A 1995?

Q Oh, I'm sorry. 1997?

A Yeah, that's probably about right, I guess.

Q All right. What time of day did you start driving a cab that day?

A I usually went to work like 4:00 o'clock in the morning and sometimes I would drive until midnight. Then sometimes I would drive eight hours, sometimes I would drive 12 hours, it all depended, you know, just on however you felt.

Q Okay.

A I worked a lot of hours.

Q Do you not remember what time of day you started on July the 2nd?

A No.

Q All right. Before July the 2nd of 1995, had you picked up people at The After Thought on Kavanaugh before?

A Oh, yeah.

Q Had you ever come into contact with the bartender there, Keith Klosky?

the type of driver that would go across town to pick anybody up, because I just like to work, you know, I don't like to just sit there, I would rather go pick somebody up. He was bidding off a call up there and I said, "Well" -- nobody said anything, I said, "Well, I will go get it." So he said, "Well, call up there at Kavanaugh and Beechwood." I said, "Okay," here I go. Zoom.

I take off, go up there, I pulled up there in front of The After Thought, all right, the waiter come out, he says, all right -- yeah, he came out and I had the windows down, because it was like summertime anyway. He said, "I've got a guy in a wheelchair, and I will be -- I will go in there and get him." And I said, "Okay." So I walked out, got around to my trunk, had the key, I was trying to get my trunk open. The trunk wouldn't open up.

And the guy come back out, he said -- he wheeled Mr. -- you know, the man in the wheelchair out. I said, "My trunk won't open up." He said, "Your trunk won't open up?" And I said, "No, it won't open up." He said, "Well" -- he acted like he was in a bad mood or something, the waiter did. I mean, he just had an attitude about himself. And he said, "Well, you can stick his wheelchair inside the back seat of your

cab." And I said, "I can't put his wheelchair in the back seat of my cab, because it ain't going to fit back there." I said, "I can send the man another cab." He said, "No," he said, "You can put it back there in your back seat of your cab." I said, "Just forget it," I said, "I will send him another cab." I just got in my cab and I drove off, you know.

I told the dispatcher, "I didn't pick the guy up, send him another cab, because my trunk won't open up on my cab." And that was the end of that deal.

Q All right.

A The waiter had an attitude, is what the whole problem was right there.

Q What kind of an attitude did he have?

A What kind of attitude?

Q (Indicated yes.)

A It was like a bossy attitude, trying to tell me I had to do this, or his wheelchair would fit in my back seat, and, well, it won't fit in my back seat because the trunk won't open up.

Q How did you know his wheelchair wouldn't fold up and go right in the back seat?

A Because it was a small cab. If you fold -- I didn't know it for sure. But anyway, the best thing to do to accommodate the man would be to send him

another cab.

Q What kind of car were you driving?

A I think at that time it was a -- let me think. I believe it was a Fifth Avenue.

Q Who makes that?

A Chrysler.

Q All right. Had you ever had any wheelchairs in the back seat of your -- in that cab before in the back seat?

A No. I always had me a strap on the trunks, the tie-down straps. You know, that way, if it was a big wheelchair, I could put it in the back, and if the trunk wouldn't shut, you put the tie-down strap and hook it up there under the bumper, that way, it was no problem at all. That way, it was just easier that way. But to put them in the back seat, that's just -- you know, there is no sense in doing that, because they won't fit, it won't fit. I mean, you can send the man another cab a lot easier than to put him -- that's just unaccommodating, that's what it is. It only takes a few more minutes to get him another cab. And it ain't my fault the trunk won't open up.

Q It is unaccommodating to fold up the chair and put it in the back seat?

A No, I didn't say that. It would be

unaccommodating to the person in the wheelchair.

Q Why is that?

A To fold it up and put it in the back seat, because they won't fit.

Q How do you know it won't fit?

A How do I know it won't fit? Because the car is small, I guess. You know, you put them in the trunk. That's what they are for.

Q But how do you know the chair wouldn't fit in the back seat?

A I don't know that it won't fit. It probably would fit. I was just trying to be accommodating, that's all.

Q The waiter that came out with Mr. Morrissey -- he brought Mr. Morrissey out to the sidewalk?

A He went in -- he went in and he said -- he went in and got him after I pulled up there, then he wheeled him out there.

Q Okay.

A That's when I told him that my trunk won't open up. And the waiter had a real bossy attitude, he said, "Well, you can just take his wheelchair and you can stick it in the back seat." I said, "Sir," I said, "my trunk won't open." He said, "You can stick it in your back seat," like he was trying to get rid

of him, you know. That was the way I felt about it. It was the waiter's attitude the whole nine yards, it wasn't the man in the wheelchair at all, it was that waiter. He was a bossy person, that's what the whole problem was right there.

Q Did Mr. Morrissey, the guy in the wheelchair, did he say anything to you?

A No.

Q Had you ever seen this waiter before?

A No.

Q Did the waiter -- did he say any curse words at you?

A I think he mumbled something, but I'm not sure if it was a curse word. I don't know what he said.

Q Okay. Did you find out later why your trunk wouldn't open?

A Yeah.

Q What was wrong with it?

A The latch.

Q Okay. When did you get that fixed?

A The next morning.

Q How much longer that night -- or what time of night was this when you went to The After Thought?

A I think it was around 9:30 at night.

Q How much longer did you drive that night?

I FURTHER CERTIFY that the above deposition was given by the witness and taken at the times and in the place hereinabove set forth.

I FURTHER CERTIFY that I am not attorney or counsel of any of the parties, nor am I relative or employee of any attorney or counsel or party connected with the action, and have no interest in the outcome or results of this litigation.

WHEREFORE, I have subscribed my signature and affixed my notarial seal as such notary public at the City of Little Rock, County of Pulaski, State of Arkansas, this the 30th day of April, 1998.

DEBBYE L. PETRE, CCR
NOTARY PUBLIC IN AND FOR
PULASKI COUNTY, ARKANSAS

My Commission Expires:
August 4, 2000.

---o---

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS

MIKE MORRISSEY PLAINTIFF

VS. NO. LR-C-97-707

CAPTIOL CAB DEFENDANT

**AFFIDAVIT OF MIKE MORRISSEY**

Comes now the affiant, Mike Morrissey, and being duly sworn to tell the truth, states:

My name is Mike Morrissey, and I am the Plaintiff in this case. I make this statement based on personal knowledge.

In September 1995 Keith Klosky informed me that when he called Capitol Cab to have them send a taxi to take me home the driver told the dispatcher that he would not go to The Afterthought to pick up someone in a wheelchair. I complained to Buck Haley, the manager of Capitol Cab, about this incident. I consulted an attorney, but I did not file a lawsuit at that time because I wanted to give Capitol Cab an opportunity to take steps to ensure that discrimination like that did not happen again. I kept using Capitol Cab since Buck Haley wrote me a letter of apology.

When I was again refused a ride on July 2, 1997 because of my wheelchair, I was angry and hurt. I have not used Capitol Cab since July 2, 1997. I continue to live and work in Little Rock, and I take taxis fairly regularly. I plan to continue to do so. If Capitol Cab will take measures to ensure that it does not continue to have drivers who

Exhibit 8

discriminate against disabled people, then I would use Capitol Cab again from time to time.

Further affiant sayeth not.

Mike Morrissey

6-4-98
Date

**ACKNOWLEDGMENT**

COUNTY OF PULASKI )
)ss.
STATE OF ARKANSAS )

Subscribed and sworn to before me this 4th day of June, 1998.

Notary Public

My commission expires:

